STATE of Missouri, Respondent,

v.

John J. MIDDLETON, Appellant.

No. 80941.

Supreme Court of Missouri,
En Banc.

Aug. 3, 1999.

Rehearing Denied Sept. 7, 1999.

Elizabeth Unger Carlyle, Lee's Summit, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Shaun J. Mackelprang, Asst. Atty. Gen., Jefferson City, for Respondent.

DUANE BENTON, Judge.

A jury convicted appellant John J. Middleton of two counts of murder in the first degree and two counts of armed criminal action, for shooting Randy Hamilton and Stacey Hodge. The jury assessed two death sentences, which the circuit court imposed. This Court has exclusive jurisdiction of the appeal. *Mo. Const. art. V, sec. 3.* Affirmed.

## I. Facts

This Court reviews the facts in the light most favorable to the verdict. *State v. Shurn,* 866 S.W.2d 447, 455 (Mo. banc 1993), *cert. denied,* 513 U.S. 837, 115 S.Ct. 118, 130 L.Ed.2d 64 (1994).

On June 10, 1995, several drug dealers were arrested in Cainsville, Missouri. Appellant, a drug dealer, worried that informants would implicate him as well. That afternoon, he told Tom Constable that

there were "some snitches that should be taken care of," because he did not want to go back to prison. He mentioned several names, including Randy "Happy" Hamilton.

The next day, appellant and his girlfriend, Maggie Hodges, met Hamilton and Stacey Hodge on a gravel road. Stacey Hodge was Hamilton's girlfriend. Appellant shot Hamilton in the back once with an SKS rifle, and shot Stacey Hodge in the back three times. Appellant then shot Hamilton in the head, killing him. Maggie Hodges killed Stacy Hodge by shooting her in the head with another SKS rifle. Both bodies were placed in the trunk of Hamilton's car. Appellant drove the car, looking for a place to dispose of the bodies. Hodges followed in a truck.

While driving around, appellant saw Danny Spurling. Appellant – covered in blood and driving Hamilton's car – said that he had "taken care" of Hamilton. He asked Spurling what to do with the bodies, indicating that he might burn them in Hamilton's old house. The next morning, appellant gave Spurling the car stereo from Hamilton's car, and said that "they were really going to freak out when they found those two." Appellant had a written list of names, and asked if Spurling knew anyone on the list.

About a week and a half later, appellant told Richard Pardun that "there was a narc around and they were going to take care of it." He said that he had a "hit list," mentioning several names on it, including Hamilton, Alfred Pinegar,[1] and William Worley. Appellant offered Pardun $3,500 to set up a meeting with Worley.

On June 25, 1995, John Thomas was at appellant's house, discussing informants. Appellant listed several people who "needed to be taken care of," including Hamilton, Pinegar, and Worley. Thomas noticed two SKS rifles and a box belonging to

---

1. Appellant was convicted of the murder of Pinegar in 1997. For the appeal in that case, see *State v. Middleton,* 995 S.W.2d 443 (Mo. banc 1999).

Hamilton. When Thomas asked about the box, appellant replied, "the guy who owned that box wouldn't be needing it no more."

About the same time, appellant visited Dennis Rickert in Iowa. Appellant told Rickert: "I'd knowed 'Happy' for 15 [years]. He knew enough to put me away for life. I done 'Happy.'" Appellant also gave Rickert several guns, including two SKS rifles, which Rickert later turned over to the police.

Appellant was arrested for another murder (Pinegar's) in late June 1995. On July 10, 1995, Hamilton's car was discovered in the woods where it had been abandoned. The car stereo was missing. The victims' decomposed bodies were in the trunk. Bullet fragments taken from Stacy Hodge's body displayed class characteristics consistent with the SKS rifles that appellant gave Rickert.

While awaiting trial in the Harrison County jail, appellant confessed to fellow inmate Douglas Stallsworth. Stallsworth testified that appellant described the murders, admitted killing Hamilton and Hodge because they were informants, and acknowledged hiding their bodies and taking the rifles to Iowa.

## II. Pretrial Matters

### A.

Appellant asserts that the trial court erred in overruling his pretrial motion to quash the information or estop the court from imposing the death sentence. Appellant argues that the State exercises unconstitutional discretion in seeking the death penalty. This point is again denied. *E.g., State v. Smith,* 944 S.W.2d 901, 923 (Mo. banc), *cert. denied,* —— U.S. ——, 118 S.Ct. 377, 139 L.Ed.2d 294 (1997).

### B.

■ Appellant alleges that the circuit court should have sustained his pretrial motion to dismiss the charge of murder in the first degree. Appellant contends that

first- and second-degree murder are indistinguishable because the definition of "deliberation" is devoid of meaning and provides inadequate notice of the crime charged. To the contrary, first- and second-degree murder are distinguishable. *State v. Rousan,* 961 S.W.2d 831, 851–52 (Mo. banc), *cert. denied,* —— U.S. ——, 118 S.Ct. 2387, 141 L.Ed.2d 753 (1998). First-degree murder requires sufficient evidence of deliberation, defined by statute as "cool reflection for any length of time no matter how brief." *Section 565.002(3).*[2] The trial court properly overruled appellant's motion to dismiss.

### C.

■ Appellant next argues that his absence at three pretrial hearings violated his statutory and constitutional rights to be present at trial. Appellant was absent from hearings on October 24, 1997; February 13, 1998; and March 13, 1998.

At the hearing on October 24, the trial court scheduled several pretrial hearings, and the defense withdrew its "Notice of Intent to Rely on the Defense of Mental Disease or Defect." The notice was re-filed on December 8, and appellant was present on December 19, when defense counsel, the prosecutor, and the court specifically discussed the notice and the court ordered a mental examination under section 552.030.3.

At the February 13 hearing, the trial court scheduled another pretrial hearing. Also on February 13, the prosecutor mentioned that appellant had, "refused to talk to [the court-appointed psychiatrist] when he met with him on ... January 21st of 1998." Defense counsel responded that appellant "has agreed that he will meet with [the psychiatrist] and cooperate with him." The court set a two-week deadline for the mental examination.

Finally, at the hearing on March 13, the court ruled on 41 defense motions. It also

---

2. All statutory citations are to RSMo 1994.

granted the State leave to file a First Amended Information.

Appellant contends that his absence at these three hearings violated his right to be present under section 546.030; article I, section 18(a) of the Missouri Constitution; and the Due Process Clause of the Fifth Amendment. He stresses that the trial court:

> ruled on the majority of the pretrial motions at these settings. The court's rulings on these motions were material to the way in which the trial was ultimately conducted and therefore to the defense strategy at that trial.

Moreover, appellant notes that he was absent when the prosecutor said he refused to submit to the court-ordered mental examination. He argues: "This strongly suggests his disagreement with his counsel's decision to present a mental illness defense."

This claim was not raised in appellant's motion for new trial. *Rule 29.11(d)* ; *see State v. Neal,* 350 Mo. 1002, 169 S.W.2d 686, 692 (1943). Accordingly, this Court reviews for plain error. *Rule 30.20.* Relief will be granted only if substantial rights are involved and the Court finds a manifest injustice or miscarriage of justice. *Id.*; *State v. Davidson,* 982 S.W.2d 238, 242 (Mo. banc 1998).

### 1. Statutory Right to Be Present

■ "No person indicted for a felony can be tried unless he be personally present, during the trial." *Section 546.030* ; *see also Rule 31.03(a).* Under the statute: "The trial does not embrace every procedural and administrative step and judicial examination of every issue of fact and law." *State v. Durham,* 416 S.W.2d 79, 83 (Mo.1967). A defendant's presence is not required at preliminary or formal proceedings or motions that do not affect guilt or innocence. *Id.*

In this case, the proceedings at issue were all pretrial. Appellant concedes that no evidence was adduced during these hearings. Defense counsel explicitly acknowledged at the March 13 hearing: "These are all our legal motions, Judge, they're not evidentiary." Nor does appellant contend that any rulings affected his guilt or innocence. Rather, he says that the "motions were clearly material to the trial of the case."

Appellant's statutory claim to be present for all motions affecting the trial is without merit. The statute requires a defendant's presence only "during the trial." *Section 546.030.* Appellant's absence at the pretrial hearings was not plain error amounting to a manifest injustice.

### 2. State Constitutional Right to Be Present

■ The Missouri Constitution provides: "That in criminal prosecutions the accused shall have the right to appear and defend, in person and by counsel." *Mo. Const. art. I, sec. 18(a).* This right is broader than that in section 546.030, but can be waived. *Neal,* 169 S.W.2d at 694. Waiver occurs when neither defendant nor defense counsel requests the defendant's presence. *Id.*; *Durham,* 416 S.W.2d at 83 ("There was no request by defendant's counsel that defendant be brought from confinement to the courtroom or that the hearing on the motion be postponed until defendant could be present."); *State v. Bizzle,* 500 S.W.2d 259, 263 (Mo.App.1973).

Here, defense counsel expressly waived appellant's presence at all three pretrial hearings. At the end of the October 24 hearing, defense counsel stated: "We were here on behalf of our client. Our client was not present in court. That was with the consent of the client." On February 13, 1998, defense counsel stated: "I did not request the court to writ in my client this morning.... Voluntarily waive my client's presence." Finally, on March 13, 1998, defense counsel began: "Judge, for the record I would note that I did not writ my client in for this hearing." Under the Missouri Constitution, appellant's absence was not plain error.

### 3. Federal Right to Be Present

The United States Constitution secures the right to be present "in some situations where the defendant is not actually confronting witnesses or evidence against him." *United States v. Gagnon*, 470 U.S. 522, 526, 105 S.Ct. 1482, 1484, 84 L.Ed.2d 486 (1985); *State v. Smulls*, 935 S.W.2d 9, 17 (Mo. banc 1996), *cert. denied*, 520 U.S. 1254, 117 S.Ct. 2415, 138 L.Ed.2d 180 (1997). A defendant has a "due process right to be present at a proceeding 'whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.'" *Gagnon*, 470 U.S. at 526, 105 S.Ct. 1482 (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105–06, 54 S.Ct. 330, 332, 78 L.Ed. 674 (1934)); *Smulls*, 935 S.W.2d at 17. The focus is whether, on the whole record, the defendant could have done or gained anything by attending. *Gagnon*, 470 U.S. at 527, 105 S.Ct. 1482; *Smulls*, 935 S.W.2d at 17.

Aside from the State's Motion for Leave to File the First Amended Information – which the State could do as of right, *Rule 23.08* – all motions at the March 13 hearing were defense motions. Most involved discovery, instructional, and other legal issues. Every defense motion about specific evidence was either sustained or taken with the case – with one exception: the court overruled the Motion to Exclude Victim Impact Evidence at Penalty Phase. *See State v. Roberts*, 948 S.W.2d 577, 604 (Mo. banc 1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 711, 139 L.Ed.2d 652 (1998) (victim impact evidence is generally admissible in the penalty phase). Defense counsel, however, next moved to "limit victim impact evidence," which motion was taken with the case. The trial court's rulings on the pretrial motions did not require appellant's input nor call for any decision or reaction from him. *Smulls*, 935 S.W.2d at 17. He "had nothing to do or gain from his presence there." *Id.*

Further, the record does not show that a defense of mental disease or defect was presented against appellant's will. Even if a defendant properly raises the defense of not guilty by reason of mental disease or defect excluding responsibility, that defense can be abandoned at trial. *See State v. Coleman*, 460 S.W.2d 719, 726 (Mo. banc 1970). Here, this defense was never mentioned after the February 13 hearing. Appellant presented no evidence of a mental disease or defect at trial. Further, appellant neither requested nor did the court submit any jury instructions on that defense. *See MAI–CR 3d 306.02A*. Therefore, even if defense counsel intended to present a defense of mental disease or defect on February 13, it was ultimately abandoned. The fact that appellant was absent when the prosecutor mentioned his refusal to submit to the court-ordered mental examination was not plain error amounting to a manifest injustice.

### III. Guilt Phase

### A.

Appellant argues that the trial court improperly admitted testimony from Dr. Deja Suthikant, an expert witness, concerning the credibility of State's witness Douglas Stallsworth. At the time of trial, Stallsworth was a patient of Dr. Suthikant at a mental hospital. During cross-examination of Stallsworth, defense counsel repeatedly elicited that Stallsworth was committed after being found not guilty "by reason of insanity," or "by reason of mental disease or defect," on a forgery charge, because he suffered from "bipolar disorder." Defense counsel continued:

MS. TURLINGTON [defense counsel]: Mr. Stallsworth, didn't you initially say that you could not remember writing the check that got you into the Harrison County jail?

A: Yes.

\* \* \*

Q: Couldn't remember that, but you can remember what happened to Mr. Middleton?

A: Yes.

In response to the defense cross-examination of Stallsworth, the State called Dr. Suthikant to testify:

MS. KOCH [prosecutor]: And what mental disease or defect does [Stallsworth] suffer from?

A: He has been diagnosed as bipolar two disorder.

Q: And does that prevent him from understanding his oath in front of the jury?

A: No.

Q: Does that prevent him from being able to recall . . .

MS. TURLINGTON: Judge I'm going to

Q: . . . and observe events?

MS. TURLINGTON: I'm going to object to this line of questioning. That issue is for the court to decide.

THE COURT: That objection will be overruled. Let's proceed.

Q: Does that prevent him from being able to understand things that he hears and be able to later testify about?

A: No, that wouldn't.

Appellant argues that this testimony was inadmissible under *State v. Taylor,* 663 S.W.2d 235, 239[7] (Mo. banc 1984), and *State v. Williams,* 858 S.W.2d 796, 801 (Mo.App.1993).

■ Generally, experts may not give opinions on the credibility of witnesses. *Taylor,* 663 S.W.2d at 239. Unlike the expert in *Taylor,* however, Dr. Suthikant did not "buttress" or "vouch too much for" Stallsworth's credibility. *Id.* at 240. In fact, Dr. Suthikant never expressed an expert opinion on the credibility of the witness. He stated that bipolar disorder has no effect – one way or the other – on Stallsworth's memory and ability to testify. This testimony is not prohibited by *Taylor. Id.* at 240, 241. *See also Beishir v. State,* 522 S.W.2d 761, 765 (Mo. banc 1975), *cert. denied,* 423 U.S. 946, 96 S.Ct. 361, 46 L.Ed.2d 280 (1975); *Williams,* 858 S.W.2d

at 801. Rather, Dr. Suthikant's testimony assisted the jurors on an issue outside of their understanding. *State v. Lawhorn,* 762 S.W.2d 820, 822 (Mo. banc 1988). Thus, the State properly rehabilitated Stallsworth after appellant raised the inference that Stallsworth's bipolar disorder affected his ability to remember.

### B.

■ Appellant next contends that the trial court should have excluded the testimony of sheriff George Martz. After appellant's arrest, Danny Spurling faced charges for several crimes in Iowa, which were dismissed. On cross-examination of Spurling, defense counsel elicited that the charges were dismissed after a meeting between sheriff Martz, Spurling, and Spurling's attorney. During cross-examination of sheriff Martz, defense counsel questioned him about a conversation with the Iowa prosecutor:

MS. TURLINGTON [defense counsel]: . . . At some point you called the prosecutor's office in Iowa?

A: I had a conversation with the prosecutor. I don't recall whether it was on the phone or how it was done, but I had a conversation.

Q: That was in regards to Mr. Spurling's cases pending in Iowa?

A: Yes.

Q: And those cases were subsequently dismissed?

A: That is correct.

The State recalled sheriff Martz to rebut the inference that he asked the Iowa prosecutor to drop the charges. On cross-examination, defense counsel again emphasized that the charges were dismissed after he talked to the prosecutor:

MS. TURLINGTON: Sheriff Martz, you did ask the prosecutor in Iowa if they could just go easy on Mr. Spurling?

A: I never said that.

Q: You discussed the cases with her though?

A: Yes.

Q: And part of that discussion was to see what kind of treatment he would receive on those cases?

A: I don't recall that.

Q: Well, you did call Iowa and talk to the prosecutor about his cases?

A: I talked to the prosecutor in Iowa, yes.

Q: Because you knew Mr. Spurling had pending cases in Iowa?

A: I knew he'd been arrested, yes.

Q: And those cases ultimately were dismissed against Mr. Spurling?

A: They were.

On redirect, the State questioned sheriff Martz about his conversation with the Iowa prosecutor. Over defense objection, he testified that the prosecutor "indicated the strength of the case [against Spurling] was weak." Appellant argues that the State cannot introduce inadmissible evidence to rebut evidence properly admitted on cross-examination.

▉▉▉▉ The scope of redirect examination is limited to subjects covered in cross-examination. *See State v. Crawford,* 619 S.W.2d 735, 739–40 (Mo.1981). On redirect, a party may examine a witness on matters that tend to refute, weaken or remove negative inferences resulting from cross-examination. *Id.; State v. Copeland,* 928 S.W.2d 828, 845 (Mo. banc 1996), *cert. denied,* 519 U.S. 1126, 117 S.Ct. 981, 136 L.Ed.2d 864 (1997). A party may not, however, introduce inadmissible evidence to rebut inferences raised by the introduction of admissible evidence during cross-examination. *State v. Shurn,* 866 S.W.2d 447, 458 (Mo. banc 1993), *cert. denied,* 513 U.S. 837, 115 S.Ct. 118, 130 L.Ed.2d 64 (1994). *See State v. Chambers,* 891 S.W.2d 93, 103 (Mo. banc 1994) (irrelevant evidence, which would otherwise be inadmissible, can become relevant and admissible if an issue is raised on cross-examination). Absent an exception, hearsay testimony cannot be used to rebut inferences drawn from admissible evidence adduced during cross-examination. *Chambers,* 891 S.W.2d

at 103. *See also Shurn,* 866 S.W.2d at 458; *State v. Weaver,* 912 S.W.2d 499, 510 (Mo. banc 1995), *cert. denied,* 519 U.S. 856, 117 S.Ct. 153, 136 L.Ed.2d 98 (1996); *Copeland,* 928 S.W.2d at 845.

▉▉▉▉ The "curative admissibility doctrine" applies after one party introduces inadmissible evidence. *State v. Shurn,* 866 S.W.2d 447, 458 (Mo. banc 1993). In that situation, the opposing party may introduce otherwise inadmissible evidence of its own to rebut or explain inferences raised by the first party's evidence. *Id. State v. Lingar,* 726 S.W.2d 728, 734–35 (Mo. banc 1987). Thus, where one party repeatedly refers to a hearsay statement, the opposing party may introduce that statement to refute any negative inferences. *State v. Debler,* 856 S.W.2d 641, 648–49 (Mo. banc 1993). Here, defense counsel twice questioned sheriff Martz about the content of his conversation with the Iowa prosecutor, both times emphasizing the inference that the charges against Spurling were dropped at Martz's request. Therefore, the hearsay was properly admitted in rebuttal.

### C.

▉▉▉ Appellant next asserts that the trial court erroneously allowed evidence of his escape from jail while awaiting trial in this case. On September 14, 1995, trooper Christopher Forck was in the Highway Patrol office on the second floor of the Harrison County courthouse. Forck heard a noise from the jail on the third floor. Investigating, he discovered appellant standing outside the locked cell area.

Appellant claims that because he was also awaiting trial for the murder of Alfred Pinegar, his escape does not evidence a consciousness of guilt in this case. He notes that he might have been trying to visit Maggie Hodges, who was incarcerated in the women's side of the jail.

▉▉▉▉ "Proof of escape from jail is generally admissible to show a consciousness of guilt." *State v. Thompson,* 985

S.W.2d 779, 789 (Mo. banc 1999). Such evidence is admissible even where the defendant is being held on multiple charges at the time of the escape. *State v. Hughes*, 596 S.W.2d 723, 728–30 (Mo. banc 1980). Whether the escape was motivated by a consciousness of guilt or another reason is for the jury. *Thompson*, 985 S.W.2d at 789. This point is denied.

## IV. Penalty Phase

### A.

▆▆▆▆ Appellant alleges that the trial court should have admitted part of the testimony of penalty-phase witness William Worley. Appellant's theory in the penalty phase was that at the time of the murders, he was under a severe mental or emotional disturbance resulting from chronic methamphetamine use. *See section 565.032.3(2)*. Three penalty-phase witnesses, including Worley, and one expert witness described appellant's paranoid delusions and hallucinations. Cross-examining Worley, defense counsel tried to ask: "What else did John Middleton say to you that causes you to say he was acting weird?" The State objected on hearsay grounds, which the trial court sustained. Appellant argues that the requested testimony was not hearsay, and its exclusion violated his right to present mitigating evidence. Appellant did not make an offer of proof nor raise this in his motion for new trial. *See State v. Clay*, 975 S.W.2d 121, 131 (Mo. banc 1998). Therefore, this Court reviews for plain error. *Rule 30.20*. The challenged ruling was not plain error resulting in manifest injustice or miscarriage of justice. *Id.*

### B.

▆▆▆▆ Appellant next says that the trial court should have sustained his objection to part of the State's penalty-phase argument. Before this trial, appellant had been convicted and sentenced to death for the murder of Alfred Pinegar. In penalty-phase closing argument, defense counsel stated:

MS. DAVIS [defense counsel]: The fact of the matter is John Middleton can only be killed once. And he's already under a sentence of death....

And it might be said that you should impose two more sentences of death to make a total of three sentences of death because maybe he won't be executed the first time around. Missouri is a killing state. We're right up there behind Texas and Florida. We kill our killers. We do that in Missouri.

\* \* \*

In those rare occasions when you might have heard somebody under a sentence of death has had their life spared, chalk it up to a higher intervention.

In response, the State argued in its penalty-phase rebuttal argument:

MS. KOCH [prosecutor]: Ms. Davis may be real sure that this defendant isn't going to get out, but I'm not.

\* \* \*

Ms. Davis mentioned to you about those few occasions where a person's life is spared. She didn't talk to you about the many appeals that people go through.

\* \* \*

She didn't talk about the many different levels of appeals that these cases go through. She didn't talk to you about the federal court of appeals and how often those cases get overturned on appeal because they're death penalty cases. She didn't talk to you about any of that, did she?

Appellant alleges that this argument diminished the responsibility of the jury, contrary to *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (finding reversible error where the prosecutor "minimize[d] the jury's sense of

responsibility for determining the appropriateness of death").

■ "A prosecutor has considerable leeway to make retaliatory arguments in closing. A defendant may not provoke a reply and then assert error." *State v. Roll,* 942 S.W.2d 370, 378 (Mo. banc 1997) (citing *State v. Parker,* 886 S.W.2d 908, 922 (Mo. banc 1994)). Here, the prosecutor responded to the defense argument that appellant would be killed whether or not this jury returned a sentence of death. The prosecutor did not minimize the jury's responsibility in this case. Rather, her comments addressed the finality of appellant's sentence in a different case. *Caldwell,* therefore, is inapposite. This point is denied.

### C.

■ Appellant next contends that the trial court submitted an improper aggravating circumstance. Although appellant murdered Alfred Pinegar two weeks *after* he murdered Hamilton and Hodge, appellant was tried and convicted of Pinegar's murder *before* the trial in this case. Over appellant's objection, the court submitted and the jury found the following statutory aggravating circumstance: "The offense was committed by a person with a prior record of conviction for murder in the first degree...." *Section 565.032.2(1).* Appellant argues that, to submit this aggravator, the prior conviction must have occurred before the commission of the offense charged.

■ This Court, however, will affirm if "there is a finding of one valid aggravating circumstance beyond a reasonable doubt." *State v. Jones,* 979 S.W.2d 171, 186 (Mo. banc 1998). Here, the jury found three aggravating circumstances. Only one is challenged by appellant. This point is denied.[3]

### D.

■ Appellant next alleges that the trial court erroneously overruled his objections to Instructions 22 and 27, patterned after MAI–CR 3d 313.41A. Instruction 22 reads:

> As to Count I, if you have found beyond a reasonable doubt that one or more of the statutory aggravating circumstances submitted in Instruction 21 exists, then you must decide whether there are facts and circumstances in aggravation of punishment which, taken as a whole, warrant the imposition of a sentence of death upon the defendant.[4]

If the jury finds that aggravating circumstances warrant the death sentence, then it considers mitigating evidence. *See section 565.030.4.* Appellant argues that this scheme violates his constitutional rights to due process and freedom from cruel and unusual punishment. "As we have explained in previous cases, however, the jury's decision that the death penalty is *warranted* is not the same as deciding that it *shall be imposed.*" *State v. Simmons,* 955 S.W.2d 729, 743[31] (Mo. banc 1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1081, 140 L.Ed.2d 138 (1998) (emphasis in original).

## V. Proportionality Review
### A.

According to appellant, this Court's proportionality review violates his constitutional right to due process and effective assistance of counsel. This claim has been repeatedly denied. *Clay,* 975 S.W.2d at 146; *Rousan,* 961 S.W.2d at 854–55.

### B.

■ This Court conducts an independent review of all death sentences. *Section 565.035.3.* Three factors are considered.

---

3. Neither party mentions *State v. Harris,* 870 S.W.2d 798, 813 (Mo. banc 1994). This Court need not address the dicta in that case on section 565.032.2(1).

4. Instruction 27 is identical to Instruction 22 except that it refers to Count II, instead of Count I, and it refers to Instruction No. 26, instead of Instruction 21.

First, this Court determines: "Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor." *Section 565.035.3(1)*. As previously discussed, appellant's specific allegations are without merit. In addition, an independent review of the record reveals that the death sentences were not imposed under the influence of passion, prejudice, or any other arbitrary factor.

Second, this Court assesses: "Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance...." *Section 565.035.3(2)*. For both first-degree murder convictions, the court submitted and the jury found three statutory aggravating circumstances: (1) appellant had a prior conviction of murder in the first degree; (2) appellant murdered the victim while engaged in the attempted commission of another unlawful homicide; and (3) the murder involved depravity of mind, because appellant killed the victim as part of a plan to kill more than one person, exhibiting a callous disregard for the sanctity of all human life. Appellant does not attack any aggravating circumstance as unsupported by evidence. A certified copy of appellant's prior first-degree murder conviction was admitted, and physical evidence and witness testimony established the commission of a double homicide. The evidence was sufficient to support all aggravating circumstances.

Finally, this Court weighs: "Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime, the strength of the evidence and the defendant." *Section 565.035.3(3)*. The death sentence is frequently imposed where the defendant murdered more than one person. *E.g., State v. Johnson*, 968 S.W.2d 123, 135 (Mo. banc 1998), *cert. denied*, — U.S. —, 119 S.Ct. 348, 142 L.Ed.2d 287 (1998) (citing authority); *State v. Hutchison*, 957 S.W.2d 757, 767 (Mo. banc 1997). Moreover, the death sentence has been imposed where the de-fendant murdered potential witnesses. *E.g., State v. Parker*, 886 S.W.2d 908, 934 (Mo. banc 1994), *cert. denied*, 514 U.S. 1098, 115 S.Ct. 1827, 131 L.Ed.2d 748 (1995) (citing authority). Here, the evidence established that appellant had a list of suspected informants, whom he planned to murder in order to avoid going back to prison. To this end, he killed three people. Under the facts and circumstances at trial, the death sentences in this case are neither excessive nor disproportionate.

## VI. Conclusion

The judgment is affirmed.

All concur.