# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 04-3160

_____

John Middleton,

        Appellant,

        v.

Don Roper,[1]

        Appellee.

Appeal from the United States
District Court for the
Western District of Missouri.

_____

Submitted: December 12, 2005
Filed: July 6, 2006

_____

Before LOKEN, Chief Judge, WOLLMAN and RILEY, Circuit Judges.

_____

RILEY, Circuit Judge.

A Missouri state court sentenced John A. Middleton (Middleton) to death following Middleton's convictions for two counts of first-degree murder. The Missouri Supreme Court affirmed Middleton's convictions and sentences on direct appeal, and later affirmed the denial of his motion for post-conviction relief. Middleton timely applied for a writ of habeas corpus under 28 U.S.C. § 2254. The

_____

[1]Pursuant to Fed. R. App. P. 43(c)(2), Don Roper, the current Superintendent of the Potosi Correctional Center and successor to Al Luebbers, is substituted as party appellee.

district court[2] denied habeas relief, but granted Middleton a certificate of appealability on eight grounds. We affirm.

## I.    BACKGROUND

We recite the facts of Middleton's crimes as found by the Missouri Supreme Court in previously published opinions in this case. See State v. Middleton, 998 S.W.2d 520, 523-24 (Mo. 1999) (en banc) (affirming Middleton's convictions and sentences on direct appeal); Middleton v. State, 80 S.W.3d 799, 803-04 (Mo. 2002) (en banc) (affirming the denial of Middleton's motion for post-conviction relief).

On June 10, 1995, several drug dealers were arrested in Cainsville, Missouri. Middleton, a drug dealer who was not arrested, worried informants would implicate him. That afternoon, Middleton told another individual there were "some snitches that should be taken care of," because Middleon did not want to return to prison. Middleton mentioned several names, including Randy "Happy" Hamilton (Hamilton).

On June 11, Middleton and his girlfriend met Hamilton and Stacey Hodge (Hodge), Hamilton's girlfriend, on a gravel road. Middleton shot Hamilton in the back once with an SKS rifle and shot Hodge in the back three times. Middleton then killed Hamilton with a shot to the head. Middleton's girlfriend killed Hodge with another SKS rifle by shooting Hodge in the head. Middleton and his girlfriend placed both bodies in the trunk of Hamilton's car. Middleton drove Hamilton's car, looking for a place to dispose of the bodies, with Middleton's girlfriend following in a truck. While driving around in Hamilton's car, Middleton encountered Danny Spurling (Spurling). Middleton, covered in blood, told Spurling he had "taken care" of Hamilton. Middleton then asked Spurling for advice on what to do with the bodies. Middleton indicated he might burn the bodies in Hamilton's old house. The next morning, Middleton gave Spurling the car stereo from Hamilton's car and said "they

---

[2]The Honorable Ortrie D. Smith, United States District Judge for the Western District of Missouri.

were really going to freak out when they found those two." Middleton also showed Spurling a written list of names and asked if Spurling knew anyone on the list.

About a week and a half later, Middleton told Richard Pardun (Pardun) "there was a narc around and they were going to take care of it." Middleton said he had a "hit list" and mentioned several names on it, including Hamilton, Alfred Pinegar (Pinegar), and William Worley (Worley). Middleton offered Pardun $3,500 to set up a meeting with Worley.

On June 25, John Thomas (Thomas) and Middleton discussed informants at Middleton's house. Middleton named several people who "needed to be taken care of," including Hamilton, Pinegar, and Worley. While at Middleton's house, Thomas noticed two SKS rifles as well as a box belonging to Hamilton. When Thomas inquired about the box, Middleton replied "the guy who owned that box wouldn't be needing it no more."

Around the same time, Middleton visited Dennis Rickert (Rickert) in Iowa. Middleton told Rickert, "I'd knowed 'Happy' for 15 [years]. He knew enough to put me away for life. I done 'Happy.'" Middleton then gave Rickert several guns, including two SKS rifles, which Rickert later turned over to the police.

Pinegar was found murdered on June 26, 1995, and Middleton was arrested for Pinegar's murder shortly thereafter.[3] On July 10, Hamilton's car was discovered abandoned in the woods. Hamilton's and Hodge's decomposed bodies were found in the trunk, and the car stereo was missing. Bullet fragments taken from Hodge's body displayed class characteristics consistent with the SKS rifles Middleton gave to Rickert.

---

[3]Middleton was convicted in 1997 for Pinegar's murder. See State v. Middleton, 995 S.W.2d 443 (Mo. 1999) (en banc).

-3-

While awaiting trial, Middleton confessed to fellow jail inmate Douglas Stallsworth, who testified Middleton described the murders, admitted killing Hamilton and Hodge because they were informants, and acknowledged hiding their bodies and taking the rifles to Iowa.

Following a jury trial in the Circuit Court of Callaway County, Missouri, Middleton was convicted of two counts of first-degree murder and two counts of armed criminal action. He was sentenced to death for each of the two murders and given consecutive ten-year sentences on the armed criminal action counts. The Missouri Supreme Court affirmed Middleton's convictions and sentences on direct appeal, Middleton, 998 S.W.2d at 531, and later affirmed the denial of post-conviction relief, Middleton, 80 S.W.3d at 817.

Middleton then sought a writ of habeas corpus under 28 U.S.C. § 2254 in federal district court. The district court denied habeas relief, but granted a certificate of appealability on the following eight claims: (1) trial counsel's failure to call Middleton's family members or former employers during the penalty phase to testify about Middleton's mental impairments and diligent work ethic; (2) trial counsel's failure to elicit additional mitigating evidence from Middleton's mother during the penalty phase; (3) trial counsel's failure to present evidence during the guilt phase regarding Middleton's mental state or intent; (4) trial counsel's failure to object to the prosecution's reference to "society's drug problem"; (5) violation of Middleton's right to be present at three pretrial hearings; (6) the prosecution's failure to disclose deals made with two of the state's witnesses; (7) admission of testimony from Sheriff George Martz (Sheriff Martz) regarding why charges were dropped against a state witness; and (8) the prosecution's penalty phase argument concerning the jury's imposition of a death sentence.

-4-

## II.   DISCUSSION

When considering the district court's denial of a habeas petition, "we review the district court's findings of fact for clear error and its conclusions of law de novo." Lyons v. Luebbers, 403 F.3d 585, 592 (8th Cir. 2005) (internal quotation omitted). Under 28 U.S.C. § 2254(d), "[w]hen a claim has been adjudicated on the merits in state court, habeas relief is warranted only if the state court proceeding resulted in (1) 'a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court,' or (2) 'a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Bucklew v. Luebbers, 436 F.3d 1010, 1015 (8th Cir. 2006) (quoting 28 U.S.C. § 2254(d)(1), (2); see, e.g., Rompilla v. Beard, 545 U.S. 374, 125 S. Ct. 2456, 2462 (2005)). A decision is "contrary to" federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). A decision is "an unreasonable application" of federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "In other words, it is not enough for us to conclude that, in our independent judgment, we would have applied federal law differently from the state court; the state court's application must have been objectively unreasonable." Rousan v. Roper, 436 F.3d 951, 956 (8th Cir. 2006) (citation omitted). Furthermore, in federal habeas proceedings, we bestow a presumption of correctness on the factual findings of the state courts, and absent procedural error, we may set such findings aside "only if they are 'not fairly supported by the record.'" Simmons v. Luebbers, 299 F.3d 929, 942 (8th Cir. 2002) (quoting Purkett v. Elem, 514 U.S. 765, 769 (1995)).

### A.    Ineffective Assistance of Counsel

Middleton raises several claims of ineffective assistance of counsel, which involve mixed questions of law and fact.  See McReynolds v. Kemna, 208 F.3d 721, 723 (8th Cir. 2000).  To overturn a conviction on grounds of ineffective assistance of counsel, Middleton must demonstrate (1) his trial counsel's performance was so deficient as to fall below an objective standard of the customary skill and diligence displayed by a reasonably competent attorney, and (2) there is a reasonable probability the outcome of the trial would have been different absent the substandard actions of trial counsel.  See Strickland v. Washington, 466 U.S. 668, 687-94 (1984).  "Judicial scrutiny of counsel's performance is highly deferential, indulging a strong presumption that counsel's conduct falls within the wide range of reasonable professional judgment."  Bucklew, 436 F.3d at 1016 (citing Strickland, 466 U.S. at 689).  With this standard in mind, we address each of Middleton's ineffective assistance claims in turn.

### 1. Failure to Call Family Members and Former Employers During Penalty Phase

Middleton first contends trial counsel provided ineffective assistance by failing to contact four former employers and two family members or call them as witnesses during the penalty phase.  The former employers, for whom Middleton worked for a few years during the early 1980s, would have testified Middleton was hard-working, diligent, reliable, quiet, and a person of limited intellect.  Middleton's uncle, Glenn Williams (Williams), would have testified Middleton's father was incarcerated for stealing, and Middleton was mentally slow and was mistreated by one of his mother's boyfriends.  Middleton's aunt, Sylvia Purdin (Purdin), often babysat Middleton when his mother visited his father in the penitentiary.  Purdin said Middleton was quiet, reserved, played alone, and acted as though he were "in a daze."  Both Williams and Purdin would have testified Middleton's mother inhaled gas fumes as a child. Middleton argues reasonably competent counsel would have investigated and called the aforementioned witnesses and there is a reasonable probability the witnesses' testimony would have persuaded the jury not to impose a death sentence.  Rejecting

-6-

this claim, the Missouri Supreme Court concluded trial counsel's investigation was reasonable and Middleton failed to prove ineffectiveness. <u>Middleton</u>, 80 S.W.3d at 809.

The state court's decision was a reasonable application of the <u>Strickland</u> standard. As the Missouri Supreme Court noted, defense counsel

> reviewed 12 boxes of materials his former attorneys gathered. These materials included deposition transcripts, some hearing transcripts, notes from witnesses, photographs, police reports, coroner reports, and forensic reports. The attorneys also reviewed his work history, engaged two mental health experts, and talked to Department of Corrections employees.

<u>Id.</u> We agree with the district court that this is not a case of inadequate investigation; rather, Middleton's counsel "had the information in hand and after consideration chose not to present it."

Middleton contends counsel's possession of the twelve boxes of materials does not indicate counsel made a strategic decision not to call one or more of the witnesses and further argues there is no reason to assume the boxes contained information that could have led trial counsel to conclude the witnesses were not worth investigating. Such an argument ignores two fundamental duties under <u>Strickland</u>: this court's duty to "indulge a strong presumption" trial counsel rendered reasonable professional assistance, and Middleton's duty to overcome this presumption. <u>See</u> <u>Strickland</u>, 466 U.S. at 689. At Middleton's post-conviction hearing, Middleton neglected to adduce evidence demonstrating trial counsel lacked a strategic justification for not calling or investigating the witnesses. No basis exists for overcoming the highly deferential <u>Strickland</u> presumption in favor of trial counsel's reasonable conduct. Thus, the state court's conclusion Middleton did not prove ineffective assistance of trial counsel was not an unreasonable application of federal law.

### 2. Failure to Elicit Mitigating Evidence from Middleton's Mother

Middleton next argues trial counsel was ineffective for failing to elicit additional mitigating evidence during the penalty phase from Middleton's mother. Middleton's mother had testified on behalf of her son during the Pinegar murder trial's penalty phase, after which Middleton was sentenced to death. During the Pinegar trial penalty phase, Middleton's mother testified to the following additional facts: Middleton's blood condition and medical problems at birth and during his childhood; the head injury Middleton suffered as a child; his alcoholic and often unemployed father who spent time in prison, did not want a family, abused Middleton's mother, and had extramarital affairs; the abusive environment in which Middleton was raised; Middleton's receipt of alcohol and marijuana from his mother's boyfriend, his sister's husband, and a cousin; and Middleton's learning impairments. During the post-conviction hearing, Middleton introduced the Pinegar trial transcript of his mother's testimony and questioned trial counsel, who testified she did not recall reading the mother's Pinegar trial testimony. Counsel's failure to do so, Middleton argues, demonstrates Middleton suffered prejudice because there is a reasonable probability the jury would have rendered a punishment other than death had it heard this additional testimony from Middleton's mother.

The Missouri Supreme Court concluded Middleton failed to prove trial counsel's conduct was unreasonable, stating, "[t]his evidence–that trial counsel did not read [Middleton's] mother's Pinegar testimony–proves only that counsel did not learn these facts from the Pinegar trial. Defendant did not question defense counsel about her knowledge and why she chose not to elicit these facts." Middleton, 80 S.W.3d at 810. Additionally, the Missouri Supreme Court found Middleton failed to demonstrate a reasonable probability he would have received a punishment other than death, given he was sentenced to death in the Pinegar trial, despite the jury having heard the testimony in question from Middleton's mother. Id.

We agree with this reasoning and thus hold the state court's conclusion Middleton failed to demonstrate ineffective assistance of counsel was not an

unreasonable application of <u>Strickland</u>. There is no evidence trial counsel either was unaware of the additional information from Middleton's mother or lacked a rational justification for omitting it from the penalty phase. Middleton did not satisfy his burden to overcome the presumption of counsel's reasonable performance. Further, the fact the jury sentenced Middleton to death in the Pinegar trial weakens Middleton's argument that a different outcome would have resulted in this case but for counsel's failure to elicit additional testimony from Middleton's mother. As the district court recognized, "different juries may come to different conclusions, but the tactic's failure in one case certainly provided justification for counsel not to pursue it a second time." Accordingly, finding no error by the courts below, we deny Middleton's claim for habeas relief on this point.

### 3. Failure to Present Evidence Regarding Middleton's Mental State

During the trial's guilt phase, defense counsel did not present any evidence. Rather, defense counsel attacked the credibility of the state's witnesses and contended during closing argument the state had not proven guilt beyond a reasonable doubt. Following the jury's verdict of guilty and during the penalty phase, the defense called Dr. Jonathan Lipman (Dr. Lipman), a neuropharmacologist, who testified Middleton's chronic methamphetamine use caused him symptoms consistent with paranoid schizophrenia such as delusions, hallucinations, and paranoia, and concluded Middleton suffered from extreme mental or emotional disturbance at the time of the murders. During the penalty phase closing argument, defense counsel relied upon this testimony to support one of its arguments against imposing the death penalty.

Middleton now asserts counsel provided ineffective assistance by failing to present expert testimony during the guilt phase that Middleton was not guilty by reason of mental disease or defect or suffered from diminished capacity. Specifically, Middleton argues counsel should have called Dr. Lipman, along with Dr. Philip Murphy (Dr. Murphy), a clinical psychologist, and Dr. A.E. Daniel (Dr. Daniel), a psychiatrist, to testify during the guilt phase that Middleton's drug use impaired his mental faculties, and that Middleton lacked the ability to recognize the wrongfulness

of his actions or thereby form the intent necessary to be convicted of first-degree murder. According to Middleton, presenting such evidence during the guilt phase would have resulted in a more unified, consistent theme during the two phases of the trial, making it more likely the jury would have imposed only a life sentence.

Rejecting Middleton's claim of error, the Missouri Supreme Court held counsel investigated but reasonably chose not to present defenses of diminished capacity and mental disease or defect during the guilt phase based on (1) Middleton's assertion he did not want to present that defense, (2) Middleton's assertion of innocence, and (3) counsel's fear that presenting contradictory defenses during the guilt phase was not sound trial strategy. Middleton, 80 S.W.3d at 806-07. The district court agreed, noting the evidence relied upon by Middleton was not entirely helpful and did not clearly demonstrate Middleton lacked the ability to form the requisite intent. Thus, the district court concluded Middleton did not demonstrate ineffective assistance of counsel.

In determining whether Middleton is entitled to relief, we examine whether counsel acted in an objectively reasonable manner in choosing not to present evidence of Middleton's mental condition or intent during the trial's guilt phase. Based on our review of the record, we conclude trial counsel acted reasonably in eschewing the introduction of such evidence for several reasons. First, "[t]he reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." Strickland, 466 U.S. at 691. At Middleton's post-conviction proceeding, trial counsel testified Middleton was aware of the possibility of pursuing a defense based on diminished capacity or mental disease or defect, but insisted he was not present at the murder scene. Professing his innocence, Middleton asserted he did not want counsel to present a diminished capacity defense. Middleton did not testify at the post-conviction proceeding; thus, counsel's testimony on this point stands unrebutted. Counsel's adherence to Middleton's desired defense supports a conclusion of reasonably effective assistance.

Second, while presenting inconsistent theories or defenses may be plausible in some cases, at other times it may not be sound trial strategy. We give great deference to counsel's informed strategic decisions, noting we "must resist the temptation to second-guess a lawyer's trial strategy." Laws v. Armontrout, 863 F.2d 1377, 1393 (8th Cir. 1988) (en banc) (citation omitted). "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." Strickland, 466 U.S. at 690. In Weekley v. Jones, 76 F.3d 1459, 1462 (8th Cir. 1996) (en banc), this court rejected a claim of ineffective assistance for counsel's failure to pursue a defense of not guilty by reason of insanity. In doing so, we recognized that while pleading in the alternative is legally permissible, "there is much respectable opinion to the effect that jurors are put off by it and regard it with suspicion. In fact, there is considerable empirical evidence that insanity pleas in and of themselves are not received favorably by jurors." Id. at 1463.

Third, trial counsel's reasonable hesitance in presenting alternative defenses is bolstered by other difficulties in the case, including evidence of advance planning and expert testimony that contradicted the notion of Middleton's inability to form the requisite intent. We agree with the district court's remarks that "the facts surrounding the commission of the crime suggest (1) a legitimate reason for [Middleton]'s fears that the victims might be a threat to his freedom, and (2) a degree of planning and advance thought that demonstrated the requisite mental state." Furthermore, the proffered expert opinions are not entirely favorable to Middleton's position on appeal. During the trial's penalty phase, Dr. Lipman testified Middleton would have known it was illegal to kill someone despite the fact Middleton suffered from an extreme emotional disturbance. In addition, although Dr. Daniel would have testified about Middleton's inability to reflect coolly in advance upon his actions, Dr. Daniel also admitted he was unaware of certain facts about the murder, such as Middleton's arrangement of a meeting with the victims in an isolated location, and that such facts might affect his ultimate conclusion. As the district court correctly found, the state court reasonably applied federal law in denying this claim.

-11-

### 4. Failure to Object to Prosecution's Closing Argument

Middleton asserts trial counsel was ineffective for failing to object during penalty phase closing arguments following the prosecution's reference to society's drug problems. "To establish ineffective assistance of counsel for failing to object to a prosecutor's closing argument, [Middleton] must demonstrate, as in every ineffective assistance claim, not only that counsel's performance was deficient, but also that there is a reasonable probability that, but for counsel's failure to object, the result of the proceeding would have been different." Bucklew, 436 F.3d at 1021. We will grant habeas relief if the prosecutor's comments were so inappropriate as to make the trial fundamentally unfair and the resulting conviction a denial of due process. See Darden v. Wainwright, 477 U.S. 168, 180-81 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637 (1974)).

During closing arguments in the penalty phase, the prosecution argued:

> Another reason you need to give [Middleton] the death penalty for both of these crimes is because you have heard a lot about drugs, not only in this trial about methamphetamine but you've probably heard on the news how bad the methamphetamine problem is. Hear all the time about labs getting shut down and how the problem keeps growing. Well, what kind of message do you send to those drug dealers out there–

The court overruled an objection by defense counsel, and the prosecution continued:

> What kind of message do you send to those drug dealers out there who are keeling [sic] methamphetamine who are afraid of going to jail, afraid of getting caught when you give somebody life without parole? Not a very strong message. . . . When you give them the highest punishment this state has to offer, which is the death penalty, you send a message. . . . We're not going to tolerate drugs and we're not going to tolerate anybody who kills because of drugs. And that's why you need to give this man, not one, but finish that circle and give him two more death penalties. Do it as an insurance policy and do it so that everybody in the northeast Missouri will know that the people of Missouri are not

-12-

going to tolerate people killing to save themselves from going to jail. Because that's exactly what this man did.

Defense counsel did not object a second time. Middleton faults counsel for failing to do so, contends the argument invited the jury to sentence him to death for drug dealing, a non-capital offense, and argues but for this error, Middleton would have received a sentence of life imprisonment without parole.

The Missouri Supreme Court rejected Middleton's claim, finding the trial court overruled defense counsel's first objection, and repeated objections might have alienated jurors or drawn attention to the complained-of argument. Middleton, 80 S.W.3d at 816. The Missouri Supreme Court further found the prosecution's argument, as a whole, was proper, given the prosecution clarified that persons who murder to facilitate drug dealing deserve the death penalty, after initially inferring mere drug dealing warranted the death penalty. Id. The district court agreed: although it found the prosecution's argument "arguably improper," it held Middleton suffered no prejudice. Viewing the prosecution's closing argument in its entirety and in context, the district court concluded the jury was not invited to vote for the death penalty simply because of Middleton's involvement with drugs.

We agree with the conclusion of the Missouri Supreme Court and the district court that trial counsel did not provide ineffective assistance. Middleton fails to demonstrate trial counsel's performance was deficient. See Strickland, 466 U.S. at 687. Often, trial counsel will withhold objections during otherwise improper arguments–especially during closing arguments–for strategic purposes. Where an objection previously has been made and overruled, repeated objections to the same subject matter may simply draw the jury's attention to the complained-of argument or perhaps irritate or alienate the jury. Here, trial counsel objected once during the prosecution's closing argument and was overruled. Counsel's decision to forgo repeated objections falls within the wide range of reasonable professional conduct.

-13-

Similarly, Middleton fails to demonstrate a reasonable probability the error complained of affected the proceeding's outcome. See id. The prosecution's argument advocated capital punishment for people who murder to facilitate drug dealing or to avoid going to jail, as opposed to people who simply use, deal, or are involved with drugs. For that reason, we also are unconvinced this argument, as a whole, was improper. Thus, the Missouri Supreme Court did not act contrary to, nor unreasonably apply, clearly established federal law in determining trial counsel was not ineffective for withholding additional objections during the prosecution's closing argument.

### 5. District Court's Failure to Consider Cumulative Effect of Ineffective Assistance Claims

Notwithstanding the deficiencies of each ineffective assistance of counsel claim, Middleton argues the district court erred by analyzing individually the prejudice resulting from his multiple claims and by concluding each claim must rise or fall on its own merits. Citing Strickland and its progeny, including Wiggins v. Smith, 539 U.S. 510 (2003), and Williams v. Taylor, 529 U.S. 362 (2000), Middleton contends the district court should have considered the cumulative effect of trial counsel's errors in determining Strickland prejudice.

We reject Middleton's argument for two reasons. First, Middleton advances an erroneous interpretation of Supreme Court precedent. Neither Wiggins nor Williams stand for the proposition courts should accumulate the prejudice from separate ineffective assistance claims in determining whether to grant habeas relief. Rather, both decisions involved only a *single claim* of ineffective assistance of counsel–namely, trial counsel's failure to investigate and present mitigating evidence during the trial's penalty phase. See Wiggins, 539 U.S. at 514; Williams, 529 U.S. at 390.

Second, Middleton's argument contradicts Eighth Circuit precedent. We repeatedly have recognized "a habeas petitioner cannot build a showing of prejudice

-14-

on a series of errors, none of which would by itself meet the prejudice test." Hall v. Luebbers, 296 F.3d 685, 692 (8th Cir. 2002) (citation omitted); see, e.g., United States v. Robinson, 301 F.3d 923, 925 n.3 (8th Cir. 2002) (recognizing "the numerosity of the alleged deficiencies does not demonstrate by itself the necessity for habeas relief," and noting the Eighth Circuit's rejection of cumulative error doctrine); Wainwright v. Lockhart, 80 F.3d 1226, 1233 (8th Cir. 1996) ("Errors that are not unconstitutional individually cannot be added together to create a constitutional violation." (citation omitted)); Scott v. Jones, 915 F.2d 1188, 1191 (8th Cir. 1990) (holding "cumulative error does not call for habeas relief, as each habeas claim must stand or fall on its own" (citation omitted)). Therefore, we have no hesitancy in rejecting Middleton's argument and concluding the cumulative effect of alleged trial counsel errors is not grounds for granting habeas relief.

### B. Proceedings *In Abstentia*

Middleton next argues his absence at three pretrial motion hearings held on October 24, 1997, February 13, 1998, and March 13, 1998, violated his statutory and constitutional rights to be present at trial.[4] On direct appeal, the Missouri Supreme Court rejected Middleton's claim, finding (1) Missouri statutory law has not interpreted the right to be personally present during trial to include pretrial motion hearings, (2) the Missouri constitutional right to be present is waived unless the defendant's presence is requested and Middleton's defense counsel at each hearing expressly waived Middleton's presence, and (3) the United States Constitution did not require Middleton's presence at the pretrial hearings. Middleton, 998 S.W.2d at 524-26. The district court affirmed, concluding that it was not empowered to review the state court's determination concerning Middleton's rights under state law and that Middleton's absence did not violate his due process rights.

---

[4]Middleton also alleges he was absent from a fourth hearing held on December 19, 1997. However, the record indicates Middleton was present for that hearing.

Like the district court, we lack authority to review the Missouri Supreme Court's interpretation and application of state law, for "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." Id. at 68 (citations omitted). Thus, we limit our inquiry to whether Middleton's absence at three pretrial hearings violated his federal constitutional right to be present at trial.

A defendant has a due process right to be personally present in judicial proceedings "whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge." Kentucky v. Stincer, 482 U.S. 730, 745 (1987) (quoting Snyder v. Massachusetts, 291 U.S. 97, 105-06 (1934)). The defendant's "privilege of presence is not guaranteed when presence would be useless, or the benefit but a shadow, [but] due process clearly requires that a defendant be allowed to be present to the extent that a fair and just hearing would be thwarted by his absence." Id. (internal quotations and citations omitted). When there is no indication the defendant could have done or gained anything had he attended the hearing, there is no due process violation. See United States v. Gagnon, 470 U.S. 522, 527 (1985) (per curiam).

Our review of the nature of the proceedings in question leads us to conclude no due process violation occurred because of Middleton's absences. The first pretrial hearing, held on October 24, 1997, involved the scheduling of pretrial conferences as well as the prosecution's motion to compel the discovery of tapes and notes possessed by Drs. Murphy and Lipman. The scheduling of conferences did not require Middleton's presence. Simply put, there is no indication Middleton could have done or gained anything concerning these matters had he attended the hearing, and thus no due process violation occurred. We reach a similar conclusion with respect to the prosecution's motion to compel. The materials sought by the prosecution had been prepared in connection with the Pinegar murder trial, and at the time of the motion to

compel, Middleton's trial counsel had not yet fully examined the materials, because counsel still was contemplating whether to pursue a defense based on mental disease or defect. During the hearing, defense counsel moved to withdraw the notice of intent to rely on such a defense, which had been filed by Middleton's prior attorneys, to consider the matter more fully and to avoid providing materials not mandated by the law. Defense counsel refiled the notice, and the trial court considered the subject at a hearing on December 19, 1997, at which Middleton was present. Given defense counsel withdrew the notice and the trial court later addressed the notice extensively during a hearing at which Middleton was present, Middleton's presence at the October 24, 1997, hearing would have been "useless, or the benefit but a shadow." See Stincer, 482 U.S. at 745. In addition, Middleton's defense counsel informed the court Middleton consented to proceeding with the hearing in his absence. Thus, the Missouri Supreme Court reasonably applied federal law in concluding no due process violation occurred.

The February 13, 1998, hearing similarly involved routine scheduling matters. Also during the hearing, the prosecution stated Middleton had refused to talk to the court appointed psychiatrist. Defense counsel responded Middleton now was willing to meet and cooperate with the psychiatrist. The trial court then set a two-week deadline for Middleton's mental examination. Middleton asserts his refusal to submit to the court ordered mental examination "strongly suggests his disagreement with his counsel's decision to present a mental illness defense," and that because of his absence, "the court could not make inquiry" regarding Middleton's position. For several reasons, we reject such an argument as wholly illogical. First, at trial Middleton presented no evidence of a mental disease or defect; thus, counsel clearly complied with Middleton's reported resistance to this defense. Second, Middleton fails to demonstrate how his presence at the hearing was necessary or would have been useful, how his absence prejudiced his defense, or how the outcome of the proceedings would have been different. Third, Middleton's alleged disagreement to the presentation of a mental illness defense contradicts his other argument that defense counsel provided ineffective assistance by failing to present expert testimony during

-17-

the guilt phase of Middleton's mental state or intent, as discussed supra. Fourth, Middleton's defense counsel stated he "[v]oluntarily waive[s] my client's presence." Thus, no due process violation resulted from Middleton's absence at the February 13, 1998, hearing.

Finally, during the March 13, 1998, hearing, the trial court addressed forty-one defense motions: eight were granted at the hearing, thirteen were taken with the case to be considered later, three motions involving discovery issues and one motion expressing Middleton's desire to wear street clothes at trial and to appear without restraints were granted in part and denied in part, and sixteen motions dealing with legal issues or procedural matters were denied. No evidence was presented and no witnesses testified during this hearing. Middleton summarily contends he "was entitled to be present, to assist his counsel in presenting these motions, and to hear the court's rulings on them." However, he fails to demonstrate what could have been gained by his presence, what was lost by his absence, or what could have been added to counsel's arguments. Moreover, the hearing began by Middleton's defense counsel noting she "did not writ [Middleton] in for this hearing."

On the record before us, we cannot say Middleton's absence from any of the three pretrial hearings resulted in a due process violation.

## C. Undisclosed Deals for Two Prosecution Witnesses

Middleton claims the prosecution failed to disclose deals made in exchange for the testimony of two prosecution witnesses, Thomas and Spurling, in violation of the Fourteenth Amendment's Due Process Clause. The Missouri Supreme Court held Middleton did not prove any understanding for favorable treatment between any prosecutor and the two witnesses at issue. Middleton, 80 S.W.3d at 804-06. The district court agreed, concluding the state courts' determinations there were no deals was a reasonable interpretation of the evidence.

The pertinent facts regarding Thomas show that on June 8, 1995, Thomas was charged with selling drugs, a class B felony. On February 27, 1998, Thomas, his counsel, and the state appeared in court, and the state advised the court Thomas's proceedings were delayed due to Thomas's participation as a witness in a companion proceeding. On March 17, Thomas waived arraignment and pled not guilty, and the case was continued. On March 31, Thomas testified for the state in Middleton's trial. Less than one month later, Thomas pled guilty to attempting to sell drugs, a class C felony, and eventually was sentenced to five years' supervised probation.

With regard to Spurling, after Middleton's arrest in 1995 for the murders in this case, Spurling faced eight criminal charges in Missouri. Two charges were dismissed in September 1996, almost nineteen months before Spurling testified against Middleton on March 31, 1998. Fourteen months before testifying, Spurling negotiated a plea agreement and pled guilty to two charges. The remaining four charges were dismissed one year before Middleton's trial, resulting in no pending charges when Spurling testified against Middleton.

"In habeas proceedings in federal courts, the factual findings of state courts are presumed to be correct, and may be set aside, absent procedural error, only if they are not fairly supported by the record." Simmons, 299 F.3d at 942 (internal quotation omitted). Middleton bears the burden of rebutting this presumption of correction by putting forth clear and convincing evidence. See 28 U.S.C. § 2254(e). Middleton

-19-

failed to do so.  Relying purely on the sequence of events surrounding each witness, Middleton points to no evidence, beyond mere speculation, of an undisclosed deal offered by the prosecution or even an "understanding" Thomas or Spurling would be given leniency in exchange for testifying against Middleton.  Middleton's defense counsel knew of Thomas's pending criminal charge as well as Spurling's charges and thoroughly questioned both men about the charges at trial.  Both Thomas and Spurling denied the existence of a deal with the prosecution in exchange for their testimony.  Although Middleton cites a plethora of decisions where prosecutors failed to disclose favorable deals with witnesses, Middleton utterly fails to demonstrate any analogous factual similarities to the present case.  Rather, Middleton's contention is founded solely on speculation: "it *appears* [from the sequence of events] that Thomas and Spurling testified against [Middleton] in return for favorable consideration in the cases against them" (emphasis added).  In the face of such unsupported allegations, we conclude the district court properly denied habeas relief on this ground.

## D.    Admission of Testimony from Sheriff Martz

Following Middleton's arrest in 1995, Spurling faced criminal charges in Iowa that later were dismissed.  During cross-examination of Spurling, defense counsel elicited that the charges against Spurling were dismissed following a meeting between Spurling, Spurling's attorney, and then Harrison County, Missouri, Sheriff  Martz.  Later, during cross-examination of Sheriff Martz, defense counsel established Sheriff Martz had a conversation with the Iowa prosecutor's office, and following the conversation, the charges against Spurling were dismissed.  The prosecution recalled Sheriff Martz to rebut the presumption he asked the Iowa prosecutor to dismiss the charges against Spurling.  On cross-examination, Sheriff Martz again admitted to talking to the Iowa prosecutor about the charges and thereafter the charges were dismissed.  On redirect, the prosecution questioned Sheriff Martz whether he asked the Iowa prosecutor about the strength of Spurling's pending cases.  Over defense counsel's hearsay objection, Sheriff Martz was allowed to testify the Iowa prosecutor "indicated the strength of the case [against Spurling] was weak."

On direct appeal, Middleton argued Sheriff Martz's testimony regarding the Iowa prosecutor's statement was inadmissible hearsay and violated his Sixth Amendment right to confront witnesses. Rejecting Middleton's evidentiary claim, the Missouri Supreme Court found the testimony was admissible under the state law doctrine of curative admissibility because defense counsel created the inference Spurling's charges were dropped at Sheriff Martz's request and the hearsay was properly admitted in rebuttal. Middleton, 998 S.W.2d at 527-28. The state court did not address the merits of Middleton's constitutional claim. The district court affirmed, holding (1) it lacked authority to address the state court's decision based on the state's rules regarding curative admissibility; (2) Middleton procedurally defaulted the constitutional issue by failing to raise a constitutional objection at trial; (3) even if the claim had not been defaulted, no violation of the Confrontation Clause occurred because the statement was not testimonial in nature; and (4) even if there were a Confrontation Clause violation, any error was harmless. Again, we lack authority to review the state court's decision that the hearsay testimony was admissible under the state law doctrine of curative admissibility. See Estelle, 502 U.S. at 67-68. We thus turn our attention to Middleton's Confrontation Clause claim.

Before a state prisoner is entitled to federal habeas corpus relief, he first must exhaust his state law remedies and fairly present the facts and substance of his habeas claim to the state court. See Barrett v. Acevedo, 169 F.3d 1155, 1161 (8th Cir. 1999) (en banc); Abdullah v. Groose, 75 F.3d 408, 411 (8th Cir. 1996) (en banc). "If a prisoner has not presented his habeas claims to the state court, the claims are defaulted if a state procedural rule precludes him from raising the issues now." Abdullah, 75 F.3d at 411. To satisfy the "fairly present" requirement, Middleton must have "refer[red] to a specific federal constitutional right, a particular constitutional provision, a federal constitutional case, or a state case raising a pertinent federal constitutional issue in the Missouri state court." Id. at 411-12 (internal quotation omitted); see, e.g., Morris v. Norris, 83 F.3d 268, 270 (8th Cir. 1996) (holding "habeas petitioners must have explicitly cited to the United States Constitution or federal case law in their direct appeal to preserve federal review" (citation omitted)).

-21-

Unlike the district court, we are not convinced Middleton procedurally defaulted his federal constitutional claim. Although at trial Middleton did not argue Sheriff Martz's hearsay testimony violated the Confrontation Clause, Middleton specifically raised this federal claim in his brief on direct appeal to the Missouri Supreme Court, thereby "fairly presenting" and preserving the claim for federal review. See Jones v. Jerrison, 20 F.3d 849, 854 (8th Cir. 1994) ("The federal legal theory . . . must plainly appear on the face of the petitioner's state-court briefs."). Without mentioning the Sixth Amendment issue or referencing any federal law, the Missouri Supreme Court concluded the hearsay was properly admitted in rebuttal. Middleton, 998 S.W.2d at 527-28. The absence of any explicit discussion of the constitutional issue by the state court arguably could indicate its implicit rejection of the claim on procedural default grounds, an interpretation apparently adopted by the district court when it concluded Middleton defaulted the claim by failing to object on constitutional grounds at trial. However, the United States Supreme Court has instructed "a procedural default does not bar consideration of a federal claim on . . . habeas review unless the last state court rendering a judgment in the case *clearly and expressly* states that its judgment rests on a state procedural bar." Harris v. Reed, 489 U.S. 255, 263 (1989) (emphasis added) (internal quotation and citation omitted). The question is not whether the state court *could have relied* on the state procedural bar to reject the federal constitutional claim, but instead whether the court *actually relied* on the procedural bar as an independent basis for its disposition of the case. See id. at 261-62. Absent a clear and express indication of reliance on a state procedural bar, we cannot construe the state court's opinion to have done so.[5]

---

[5]We reject the appellee's argument that the state court's opinion addressed Middleton's constitutional claim "at least by implication" by concluding the testimony fell within a firmly rooted hearsay exception. The Missouri Supreme Court never reached such a conclusion; it only deemed the hearsay admissible under the doctrine of curative admissibility. Middleton, 998 S.W.2d at 528. "The Supreme Court has rejected the argument that a state court determination admitting hearsay under state law is dispositive of a petitioner's habeas claim that his constitutional confrontation rights were violated by the admission." Paxton v. Ward, 199 F.3d 1197, 1208 (10th

Thus, we treat the issue as though it were adequately presented to the state court for review, but ignored. Because the state court did not adjudicate Middleton's constitutional claim on the merits, the deferential standard of review under 28 U.S.C. § 2254(d) does not apply, and we review the district court's factual findings for clear error and its conclusions of law de novo. See Taylor v. Bowersox, 329 F.3d 963, 967-68 (8th Cir. 2003) (citations omitted).

The district court concluded Middleton's constitutional claim would fail on the merits, even if not procedurally defaulted. In Crawford v. Washington, 541 U.S. 36, 52-54 (2004), the Supreme Court held a witness's out-of-court statements that are testimonial in nature are barred under the Confrontation Clause, unless the witness is unavailable and the defendant had a prior opportunity to cross-examine. The Supreme Court recently reaffirmed this holding in Davis v. Washington, Nos. 05-5224 and 05-5705, 2006 WL 1667285, at *6 (U.S. June 19, 2006). The district court determined the Iowa prosecutor's statement, as related by Sheriff Martz, was not testimonial in nature and thus did not fall under Crawford's rule of exclusion.

This court previously has questioned whether Crawford applies retroactively, noting the Crawford Court did not suggest the doctrine would apply retroactively and the doctrine does not appear to fall within the narrow exceptions to non-retroactivity under Teague v. Lane, 489 U.S. 288 (1989). See Evans v. Luebbers, 371 F.3d 438, 444 (8th Cir. 2004), cert. denied, 125 S. Ct. 902 (2005). However, even assuming the doctrine could apply retroactively, Crawford's categorical rule does not govern the facts of this particular case because the statement was not "testimonial." Although Crawford specifically left ambiguous the term "testimonial," the Court noted the term,

Cir. 1999) (citing Lee v. Illinois, 476 U.S. 530, 539 (1986)). Furthermore, the doctrine of curative admissibility is not a firmly rooted hearsay exception. See Idaho v. Wright, 497 U.S. 805, 817 (1990) (identifying characteristics of firmly rooted exceptions); see, e.g., United States v. Morga, 66 F.3d 336, 1995 WL 520029, at *2 (9th Cir. 1995) (unpublished table decision) ("Curative admissibility is not a firmly rooted exception.").

at a minimum, applies to "prior testimony at a preliminary hearing, before a grand jury, or at a former trial[,] and to police interrogations." Crawford, 541 U.S. at 68. The Supreme Court also recognized in Crawford, and reaffirmed in Davis, the principle that "[a]n accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." Id. at 51; Davis, 2006 WL 1667285, at *7. While not exhaustive, these definitions lead us to conclude the statement at issue in this case was not testimonial in nature. As the district court observed, the information related by Sheriff Martz "was not the product of an adversarial or custodial interview or interrogation similar to that described in Crawford," but instead emerged through circumstances more akin to "a non-custodial conversation." We agree, and thus conclude the Iowa prosecutor's comments "are not the kind of memorialized, judicial-process-created evidence of which Crawford speaks." See United States v. Manfre, 368 F.3d 832, 838 n.1 (8th Cir. 2004); cf. Davis, 2006 WL 1667285, at *8-9.

Furthermore, even if the statement violated the Confrontation Clause, any error in admitting the statement was harmless. "A violation of the Confrontation Clause is subject to harmless error analysis," which we review de novo. Barrett, 169 F.3d at 1164 (citing Pruett v. Norris, 153 F.3d 579, 590 (8th Cir. 1998)). Because it is unclear whether the state court reviewed Middleton's constitutional claim, we apply the harmless error standard of review articulated in Chapman v. California, 386 U.S. 18 (1967), and inquire whether the alleged error is harmless beyond a reasonable doubt. See Harrington v. Iowa, 109 F.3d 1275, 1279 (8th Cir. 1997); see also Barrett, 169 F.3d at 1164. In assessing whether it appears beyond a reasonable doubt the complained-of error did not contribute to the verdict obtained, we consider the importance of the witness's testimony to the entire case, whether the testimony was cumulative, whether corroborating or contradicting evidence existed, the extent of cross-examination otherwise permitted, and the overall strength of the prosecution's case against Middleton. See Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986); Harrington, 109 F.3d at 1279.

With these considerations in mind, we conclude any error stemming from the admission of the Iowa prosecutor's statement was harmless beyond a reasonable doubt. As the district court correctly observed, the statement did not directly implicate Middleton and addressed a rather minor point in the proceedings; much of Spurling's testimony was corroborated by other evidence in the case; and there was other, significant evidence establishing Middleton's guilt. The importance of the statement to the entire case was minimal, given Spurling previously denied the existence of any deal with the prosecution in exchange for his testimony and there was no other evidence, beyond mere speculation, to support the existence of such a deal. Furthermore, defense counsel extensively cross-examined both Spurling and Sheriff Martz regarding the dismissal of Spurling's criminal charges in Iowa. The overwhelming evidence against Middleton, as well as the aforementioned considerations, satisfy us any error was harmless beyond a reasonable doubt, and we therefore deny habeas relief on this ground.[6]

### E.  Prosecution's Appeals Process Argument

---

[6]We reach this conclusion without deciding whether the statement violated the Confrontation Clause under the Supreme Court's pre-Crawford decisions. We have recognized Crawford casts some doubt on whether the reliability analysis discussed in Ohio v. Roberts, 448 U.S. 56 (1980), and Roberts's progeny, "remains good law when applying the Confrontation Clause to nontestimonial hearsay." Ferguson v. Roper, 400 F.3d 635, 639-40 (8th Cir. 2005), cert. denied, 126 S. Ct. 1028 (2006) (citing Crawford, 541 U.S. at 52). However, were we to apply the Supreme Court's pre-Crawford decisions to this issue, we could not conclude on the record before us whether such decisions aid Middleton's habeas appeal. As noted *supra* in footnote 5, clearly the statement does not fall within a firmly rooted hearsay exception, yet we cannot determine from the record if the statement "is supported by a showing of particularized guarantees of trustworthiness." See Wright, 497 U.S. at 816 (internal quotation and citation omitted). Indeed, the record reveals little regarding the circumstances surrounding the making of the statement or describing the declarant's credibility or trustworthiness, or the lack thereof. See id. at 820. Nevertheless, even assuming *arguendo* the statement violated the Confrontation Clause, any error in admitting the statement was harmless.

Finally, Middleton argues he is entitled to habeas relief because the prosecution's remarks during closing argument unconstitutionally diminished the jury's view of its responsibility for imposing the death penalty. During closing arguments, defense counsel argued Middleton was already under a death sentence for the Pinegar murder and additional death sentences would only devalue human life:

> The fact of the matter is John Middleton can only be killed once. And he's already under a sentence of death. John Middleton can only be strapped down to a gurney one time and only once can a needle be inserted into his arm and only once can a lethal dose of poison be injected into his body and only once can John Middleton give up a life, have his life taken in return for these cases. . . .

> And it might be said that you should impose two more sentences of death to make a total of three sentences of death because maybe he won't be executed the first time around. Missouri is a killing state. We're right up there behind Texas and Florida. We kill our killers. We do that in Missouri. . . . In those rare occasions where you might have heard somebody under a sentence of death has had their life spared, chalk it up to a higher intervention.

In its rebuttal argument, the prosecution responded:

> [Defense counsel] may be real sure that this defendant isn't going to get out, but I'm not. . . . [Defense counsel] mentioned to you about those few occasions where a person's life is spared. She didn't talk to you about the many appeals that people go through. . . . She didn't talk to you about the many different levels of appeals that these cases go through. She didn't talk to you about the Federal Court of Appeals and how often those cases get overturned on appeal because they're death penalty cases. She didn't talk to you about any of that, did she?

The trial court overruled defense counsel's objections to the prosecution's remarks.

Middleton argues the prosecution's remarks violated <u>Caldwell v. Mississippi</u>, 472 U.S. 320, 328-29 (1985), in which the Supreme Court held "it is constitutionally

impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." Caldwell is limited to comments "that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." Romano v. Oklahoma, 512 U.S. 1, 9 (1994) (quoting Darden v. Wainwright, 477 U.S. 168, 184 n.15 (1986)). "To establish a Caldwell violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." Dugger v. Adams, 489 U.S. 401, 407 (1989).

Middleton's Caldwell claim is without merit. Contrary to Middleton's assertion, the prosecution's remarks did not diminish the jury's sense of responsibility for imposing the death penalty. Instead, the prosecution responded to defense counsel's argument concerning Middleton's death sentence for the Pinegar murder, the strong likelihood Middleton would in fact be put to death, and the illogicality of imposing additional death sentences on Middleton. To emphasize the importance of the jury's role in the present case, the prosecution reminded the jury Middleton's death sentence for Pinegar's murder was not yet final and potentially could be reversed on appeal. Considered as a whole, the prosecution's statements focused the jury on the case before it and did not "present[] an intolerable danger that the jury [would] in fact choose to minimize the importance of its role." See Caldwell, 472 U.S. at 333. Thus, we conclude the Missouri Supreme Court's rejection of Middleton's argument was a reasonable application of Caldwell to the facts of this case.

## III.   CONCLUSION

We affirm the district court's denial of habeas relief.

_____